# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00909-COA

**JORDAN CUMMINS A/K/A JORDAN KYLE CUMMINS**                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/25/2024 |
| TRIAL JUDGE: | HON. ELEANOR JOHNSON PETERSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: KATY TAYLOR SARVER |
| DISTRICT ATTORNEY: | JODY EDWARD OWENS II |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/25/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., EMFINGER AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1.    A Hinds County Circuit Court jury convicted Jordan Cummins of two counts of first-degree murder. Following the jury's verdict, the circuit court sentenced Cummins to serve life imprisonment for both counts in the custody of the Mississippi Department of Corrections. On appeal, Cummins argues (1) the evidence of malice aforethought was insufficient to prove either count of first-degree murder, (2) the verdicts were contrary to the weight of evidence, (3) the trial court erred by admitting evidence of prior bad acts, (4) the trial court gave improper jury instructions, (5) he suffered ineffective assistance of counsel,

and (6) the cumulative effect of the errors warrants reversal. Finding no reversible error, we affirm Cummins's convictions and sentences.

## FACTS AND PROCEDURAL HISTORY

¶2. On March 25, 2023, Cummins attended a St. Patrick's Day parade in Jackson, Mississippi, with his girlfriend, Jennifer Lukens. Before the parade, Cummins and Lukens met with friends in a tent on State Street. Cummins admitted during his interrogation, and witnesses testified, that Cummins got into a verbal altercation with Lukens. Due to the altercation and Cummins's behavior, the owner of the tent asked him to leave. After Cummins and Lukens left, parking-lot surveillance video shows Cummins walking to his vehicle and Lukens following behind him. Cummins got in the driver seat of the vehicle, and seemingly locked Lukens out of the vehicle. Lukens walked away, and Cummins backed into another vehicle before following her in his vehicle. Once Cummins caught up to Lukens, he moved to the passenger seat, and Lukens got in the driver seat. Lukens did not immediately drive off when they got into the vehicle.

¶3. According to testimony at trial, a separate group of parade attendees noticed a commotion inside Cummins's vehicle. The two victims, Joshua Spann and Auden Jubilee Simpkins, were a part of this group. Lukens testified that she and Cummins continued to argue in the vehicle, and she added, "I remember [Cummins] hitting the back of the seat twice and then punching the dash." Other witnesses also testified that someone yelled, "Hey, he's hitting her!" Video surveillance first showed one black male, Kamry Owens, and one

2

white male, Steve Porter, approach the vehicle, and Owens opened the passenger side door. Several others, including Spann, began approaching Cummins's vehicle. When Owens opened the passenger door, he seemingly struck Cummins, who was in the passenger seat. Owens and Porter testified that they saw Cummins grab a gun out of Lukens's purse, and Owens testified that he heard Cummins say, "I got something for y'all," as he was trying to pull Cummins out of the vehicle. At some point, Lukens ended up on the passenger side of the vehicle, and the surveillance video shows a commotion ensued on the passenger side of Cummins's vehicle for several seconds before everyone scattered. Witnesses testified that everyone ran off after Cummins began firing his gun. Owens testified that he did not see Spann grab a gun, but he noticed a handgun next to his body after he was fatally injured. The parking lot surveillance video showed Spann reach into his bag and grab a gun, and he also passed a gun to someone else, later identified as Jamarri Russell. The surveillance video from one of the vehicles in the parking lot also confirmed that Spann had a gun in his hand when he fell to the ground. Owens also noticed that Simpkins, who remained in the bed of a truck nearby, had also been shot. Another witness testified that he heard Lukens say, "[Y]ou just killed somebody we got to go." Surveillance video then shows Cummins running to the driver seat and Lukens grabbing items from the vehicle and getting in the passenger seat.

¶4.    After he surrendered to authorities that same day, Cummins was interviewed by Jermaine Magee, an investigator with Capitol Police. During the interview, Cummins maintained that he did not physically touch Lukens, but they were arguing. He continuously

3

emphasized that he was acting in self-defense and trying to protect his family. When Investigator Magee asked if things could have gone differently, Cummins responded, "Yes sir, I should've pulled off, I should have left, but I was in fear they was gone shoot me as soon as I started leaving." Investigator Magee then asked Cummins to demonstrate where he was when he started shooting. As Cummins was demonstrating how he got out of the car, he stated, "[W]hen I pulled the gun they were like 'oh alright b****' and then pulled their guns and I just started shooting." Investigator Magee asked, "[S]o you got out the car, you got your gun when they was standing around still talking noise to you?" Cummins responded, "[T]hey were kinda walking away but yeah they were still talking noise to me," and "I pulled my gun out and I just fired at them. I shouldn't have fired the whole clip. I'm wrong for what I did. I should have just left." Near the end of the interview, Cummins stated, "I was trying to hit the mother f****** that f****** put their hands on me and f****** had guns. That's who I was trying to hit."

¶5.     At Cummins's trial, the jury heard testimony from Cummins, Lukens, witnesses from the tent, witnesses to the shooting, Cummins's cousin, law enforcement officers, a forensic scientist, and the medical examiner. The jury was also presented with the surveillance video from the parking lot. During the trial, the State also admitted into evidence a video of Cummins and another inmate at the Raymond Detention Center. In the video Cummins is smiling, patting himself on the face, and saying, "Free me man. You know what I'm saying. You walk up on me man, I'm gone bust yo a** man." He then adds, "I know it looks sweet.

4

S*** ain't sweet man, two dead."

¶6.    After the State rested its case-in-chief, Cummins moved for a directed verdict on counts one and two. Cummins argued that the State had not proved beyond a reasonable doubt that he did not act in self-defense and that his firearm caused the death of Simpkins. After hearing from both sides, the circuit court denied both motions, finding that the State had met its burden of proof to send to the jury a question of whether the defendant should be found guilty of first-degree murder on both counts. Cummins proceeded to present his case-in-chief by testifying in his own defense. He testified that he was "dazed" after he was hit in the face, and he only grabbed his gun after he noticed Spann and Russell had firearms. Cummins further claimed that Russell actually fired his gun, but it jammed. Cummins also presented witness testimony from Lukens, who corroborated his testimony. At the close of his case, Cummins did not renew his motions for a directed verdict.

¶7.    After the jury deliberated, Cummins was found guilty of two counts of first-degree murder. The trial court sentenced Cummins to serve life sentences for each count to run concurrently in the custody of the Mississippi Department of Corrections. Subsequently, Cummins filed a motion for a new trial or judgment notwithstanding the verdict or a new trial, which the trial court ultimately denied.

## DISCUSSION

### I.    Sufficiency of the Evidence

¶8.    This Court reviews whether the evidence is sufficient to sustain a conviction de novo.

5

In doing so, "we view the evidence in the light most favorable to the prosecution . . . [and] determine whether the evidence presented was sufficient for a rational juror to find each essential element of the crime beyond a reasonable doubt." *Watts v. State*, 402 So. 3d 744, 748-49 (¶17) (Miss. 2025) (citations omitted). On appeal, Cummins argues that the State presented insufficient evidence to convict him of two counts of first-degree murder. First-degree murder is defined as "[t]he killing of a human being without the authority of law by any means or in any manner . . . [w]hen done with deliberate design to effect the death of the person killed, or of any human being . . . ." Mississippi Code Annotated section 97-3-19(1)(a) (Rev. 2020). The State was required to prove beyond a reasonable doubt that (1) Cummins killed Spann and Simpkins; (2) without authority of law; and (3) with deliberate design to effect their death. *See Williams v. State*, 164 So. 3d 1078, 1080 (¶7) (Miss. Ct. App. 2015).

¶9.      Cummins contends that the State did not show that he acted with premeditation or malice aforethought[1] necessary to be found guilty of two first-degree murder convictions. Based on the evidence and testimony presented at trial, Cummins reached for his gun during a heated argument between him and Lukens, aimed his gun at the people who interfered as they walked away, shot several times in their direction, and then fled the scene. On appeal,

---

[1] The phrases "deliberate design" and "malice aforethought" are synonymous under our jurisprudence and "[c]onnote[s] an intent to kill." *Pace v. State*, 369 So. 3d 588, 597 (¶30) (Miss. Ct. App. 2023) (quoting *Collins v. State*, 221 So. 3d 366, 371 (¶14) (Miss. Ct. App. 2016)).

Cummins urges that what he did was purely reflex, and only forty seconds passed from the time Owens opened his car door to when he began shooting. However, "deliberate design to kill a person may be formed very quickly, and perhaps only moments before the act of consummating the intent. . . . Intent is demonstrated by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent." *Adams v. State*, 291 So. 3d 405, 409 (¶11) (Miss. Ct. App. 2020) (quotation marks and citations omitted). In addition to witness testimony that Cummins stated, "I got something for y'all" and "Someone's fixing to die," as he grabbed and aimed his gun, Cummins stated in his interview with Investigator Magee that he was "trying to hit the mother f****** that f****** put their hands on me and f****** had guns. That's who I was trying to hit."

¶10. The record reveals sufficient evidence was presented for a rational juror to find each essential element of first-degree murder beyond a reasonable doubt in each count. Therefore, we find that the State presented sufficient evidence to support Cummins's two first-degree murder convictions.

## II. Weight of the Evidence

¶11. Cummins also challenged the weight of the evidence and sought a new trial for the same reason he raised his challenge to the sufficiency of the evidence. We review "the trial court's denial of a motion for a new trial, under an abuse of discretion standard." *Pace*, 369 So. 3d at 597 (¶33). "It is well established that the jury determines matters of weight, credibility, and conflicting evidence." *Henderson v. State*, 376 So. 3d 412, 421 (¶28) (Miss.

7

Ct. App. 2023) (quoting *Beasley v. State*, 362 So. 3d 112, 126 (¶50) (Miss. Ct. App. 2023)).

"When reviewing a challenge to the weight of the evidence, the Court will disturb a jury verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Pace*, 369 So. 3d at 597 (¶33) (quoting *Wayne v. State*, 337 So. 3d 704, 715 (¶39) (Miss. Ct. App. 2022)).

¶12.    Cummins specifically contends that he acted in justifiable self-defense, and because evidence of malice aforethought was lacking, he argues his convictions are contrary to the weight of the evidence such that an unconscionable injustice resulted. "A successful self-defense argument requires that the jury believe it was objectively reasonable for the [defendant] to believe he was in danger of imminent death or serious bodily harm." *Henderson*, 376 So. 3d at 421 (¶28). Cummins's argument fails for the same reason that his sufficiency-of-the-evidence claim fails. Again, evidence and testimony revealed that Cummins aimed his gun at the people who interfered in a heated argument between him and Lukens, and he shot several times in their direction as they walked away. During his interview with Investigator Magee, he even admitted several times that he should have left, and he knew he was wrong. A reasonable jury could find that Cummins was not in danger of imminent death or serious bodily harm.[2] Accordingly, we find no abuse of discretion in

---

[2] Cummins offered testimony at trial that directly contradicted the testimony of the State's witnesses. (Notably, at the time of Cummins's interview with Officer Magee, Cummins had not seen any parking-lot surveillance videos of the incident.) Our Supreme Court has held that "[c]onflicting testimony does not evince overwhelming evidence; '[w]here the verdict turns on the credibility of conflicting testimony and the credibility of

8

the court's decision to deny Cummins a new trial.

¶13.    After viewing the evidence in the light most favorable to the verdict, we find that the verdict was not contrary to the overwhelming weight of the evidence, and allowing it to stand would not sanction an unconscionable injustice.

### III.    Jury Instructions

¶14.    Cummins argues that the trial court erred by giving Jury Instructions 15, 19, and 22. Because these jury instructions were given without objection by Cummins, these arguments are procedurally barred on appeal. However, he asks this Court to review them under the doctrine of plain error.

> Plain-error review is properly utilized for correcting obvious instances of injustice or misapplied law. The plain error doctrine applies when there has been an error that resulted in a manifest miscarriage of justice or seriously affects the fairness, integrity or public reputation of judicial proceedings. To determine if plain error has occurred, this Court must determine if the trial court has deviated from a legal rule, whether that error is plain, clear[,] or obvious, and whether that error has prejudiced the outcome of the trial.

*Spiers v. State*, 361 So. 3d 643, 657 (¶41) (Miss. 2023) (citations and quotation marks omitted).

¶15.    "Jury instructions are generally within the discretion of the trial court[,] and the settled standard of review is abuse of discretion." *Moody v. State*, 202 So. 3d 1235, 1236-37 (¶7) (Miss. 2016) (quoting *Bailey v. State*, 78 So. 3d 308, 315 (¶20) (Miss. 2012)). Cummins

---

the witnesses, it is the jury's duty to resolve the conflict.'" *Coleman*, 441 So. 3d 137, 145 (¶33) (Miss. 2025) (quoting *Brown v. State*, 995 So. 2d 698, 702 (Miss. 2008)).

9

alleges that the following jury instructions "improperly eviscerated Cummins's valid theory of self-defense":

Jury Instruction 15

The Court instructs the jury that "deliberate design" as it is used in these instructions, means an intent to kill without authority of law, and not being legally justifiable, or legally excusable. "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, or contemplate. "Deliberate design" to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. However, a "deliberate design" cannot be formed at the very moment of the fatal act.

Jury Instruction 19

The Court instructs the jury that if the Defendant was the aggressor, the defense of self-defense is not available to him even where he must resort to defending himself against an unexpectedly aggressive intended victim.

If you find from the evidence beyond a reasonable doubt that Jordan Cummins was assaulting Jennifer Lukens, you may consider him as the initial aggressor.

Jury Instruction 22

If death is inflicted upon a person with a deadly weapon in a manner calculated to destroy life or inflict great bodily harm, then malice or the intent to kill may be inferred from the use of the weapon.

¶16. Our review of the record reveals that the jury was given several instructions, including instructions on murder, manslaughter, self-defense, and imperfect self-defense. During trial, the circuit court instructed the jury not to single out one instruction alone in reading the law but to consider the instructions as a whole. The instructions as a whole fully informed the jury as to the State's burden of proof and the defendant's self-defense theory. *Baker v. State*, 315 So. 3d 558, 564 (¶18) (Miss. Ct. App. 2021). "[D]efects in specific instructions will not mandate reversal when all the instructions, taken as a whole fairly—although not

10

perfectly—announce the applicable primary rules of law." *Saxton v. State*, 385 So. 3d 753, 757 (¶19) (Miss. 2024) (quoting *Boyd v. State*, 47 So. 3d 121, 124 (Miss. 2010)). On appeal, Cummins seemingly asks this Court to review Jury Instructions 15, 19, and 22 in isolation. However, our Supreme Court has continuously held that jury instructions "are to be read together as a whole, with no one instruction to be read alone or taken out of context. When read together, if the jury instructions fairly state the law of the case and create no injustice, then no reversible error will be found." *Nelson v. State*, 284 So. 3d 711, 716 (¶18) (Miss. 2019) (quoting *Bailey*, 78 So. 3d at 315 (¶20)). Thus, we find the jury was properly instructed, and the trial court did not commit plain error by giving jury instructions 15, 19, and 22.

¶17.    Although we find that the jury instructions as a whole fairly state the law of the case and create no injustice, we narrow our focus to Jury Instruction 19. An aggressor can still claim self-defense if he by "unequivocal acts abandons his original position of aggression and discloses that fact to his adversary in some appropriate manner." *Nelson v. State*, 362 So. 3d 1077, 1081 (¶15) (Miss. Ct. App. 2018) (quoting *Wilkinson v. State*, 143 Miss. 324, 339, 108 So. 711, 714 (1926) (Ethridge, J., dissenting)) (citing 40 C.J.S. *Homicide* § 195 (2018) ("[E]ven if a person is an aggressor, he or she can lose that status by clearly withdrawing from a fight and can evince that desire to withdraw by either word or act so long as the person's intentions are clear.")), *rev'd on other grounds*, 284 So. 3d 711 (Miss. 2019). In the case before us, testimony revealed that Cummins was aggressive with Lukens in the parking

11

lot, and when others came to her defense, Cummins presented no basis for an abandonment instruction, nor did he request one, either as a standalone instruction or as an amendment to Jury Instruction 19. There is no proof offered that the transition between Cummins's aggressive behavior toward Lukens, and his immediate aggression toward those who attempted to intervene, involved any intent by Cummins to abandon. Indeed, Cummins continued his aggressive behavior and fired his gun several times at them as they retreated. Cummins and Lukens directly refuted this testimony, but after hearing all the testimony presented at trial, "the jury was in the best position to determine the weight and credibility of [all witness] testimony." *Donelson v. State*, 158 So. 3d 1154, 1161 (¶31) (Miss. Ct. App. 2014) (quoting *Osborne v. State*, 54 So. 3d 841, 846 (¶21) (Miss. 2011)). The witness testimony during trial directly supported the fact that Cummins was aggressive with Lukens.

¶18.     The dissent states that Cummins should have been able to argue that he abandoned the alleged assault against Lukens. We have held that "a trial judge will not be found in error on a matter not presented to the trial court for a decision." *Colbert v. Colbert*, 403 So. 3d 729, 735 (¶26) (Miss. Ct. App. 2025). Nonetheless, "[a]bandonment is a defense if the attempt to commit a crime is freely and voluntarily abandoned before the act is put in process of final execution, if there is no outside cause prompting the abandonment." *Kelly v. State*, 306 So. 3d 849, 857 (¶25) (Miss. Ct. App. 2020). In *Saxton*, our Supreme Court found that although a jury instruction constituted an error in which the underlying facts of the case give rise to a viable self-defense claim, the jury instruction did not result in a manifest miscarriage of

12

justice. *Saxton*, 385 So. 3d at 759 (¶29). Unlike the case before us, Saxton testified at trial that "after he displayed the gun and [the victim] stopped pursuing him, [Saxton] decided that he did not want to hurt anybody and he tried to get himself inside, but [the victim] thereafter came at him again prompting him to grab the bat to defend himself." *Id*. Here, even if Cummins argued for an abandonment instruction at trial, there is no evidence in the record to support it. The testimony reveals that Cummins and Lukens were in the vehicle arguing when others like Spann, Owens, and Russell interrupted the argument as they came to Lukens's defense. If the jury believed from all the testimony and evidence that Cummins was having a physical altercation with Lukens when the parade goers intervened to defend Lukens, then they could reasonably find that he did not voluntarily abandon the alleged assault.

¶19.   Regardless, the jury was fully instructed on self-defense[3] even though our Supreme Court has held that an initial aggressor is not entitled to assert the defense of self-defense. *See Simmons v. State*, 805 So. 2d 452, 473 (¶30) (Miss. 2001); *see also Layne v. State*, 542 So. 2d 237, 244 (Miss. 1989). Still, we do not find that Jury Instruction 19 resulted in a manifest miscarriage of justice. Considering Jury Instruction 19, in addition to the language of the other jury instructions, we find the trial court did not abuse its discretion by giving this instruction.

---

[3] The jury was fully instructed on self-defense. One jury instruction specifically provided, "If you, the jury, unanimously find the defendant acted in self-defense, then it's your sworn duty to return a verdict in favor of the defendant."

## IV.   Admission of Other Bad Acts Evidence

¶20.    In his next assignment of error, Cummins alleges that the trial court erred by allowing evidence of other alleged bad acts. "Evidence of other bad acts is only admissible if it is relevant to an issue in the case being tried and if the prosecutor clearly articulates the alternative purpose for the evidence, showing that a Rule 404(b) exception is met." *Anderson v. State*, 354 So. 3d 411, 418 (¶21) (Miss. Ct. App. 2023) (quoting *Jones v. State*, 287 So. 3d 995, 1005 (¶34) (Miss. Ct. App. 2019)).

> A trial judge has considerable discretion as to relevancy and admissibility of evidence, and unless this judicial discretion is so abused as to be prejudicial to the accused, we will not reverse on these grounds. The relevancy and admissibility of evidence are within the discretion of the trial judge and will not be reversed unless that discretion has been abused. Thus, unless the trial court abused its judicial discretion to the point of prejudicing the accused, this Court must affirm the trial court's ruling.

*Taylor v. State*, 374 So. 3d 617, 625 (¶20) (Miss. Ct. App. 2023) (citations and quotation marks omitted). Cummins specifically claims that the trial court erred by admitting evidence of what occurred at the parade tent before the shooting, the jail video, and evidence of a prior domestic-violence incident between him and Lukens.[4]

¶21.    As it pertains to the evidence of what occurred at the parade tent before the shooting, "[p]roof of another crime or act is allowed when it is so interrelated to the charged crime that it constitutes either a single transaction or occurrence or a closely related series of

---

[4] In his brief, Cummins argues that because defense counsel asked about prior abuse, the admission of the alleged incident of domestic abuse raises "a question of ineffective assistance of counsel." Therefore, we will address this issue below.

14

transactions or occurrences." *Anderson*, 354 So. 3d at 419 (¶23) (citing *Price v. State*, 898 So. 2d 641, 653 (¶30) (Miss. 2005)). "The State has a legitimate interest in telling a rational and coherent story of what happened, and where substantially necessary to present to the jury the complete story of the crime, evidence or testimony may be given even though it may reveal or suggest other crimes." *Id*. (quoting *Davis v. State*, 40 So. 3d 525, 530 (¶18) (Miss. 2010)). The testimony from the witnesses at the parade tent was relevant and admissible to complete the State's theory that Cummins was the initial aggressor and explain why people felt the need to come to the defense of Lukens. Cummins and Lukens were in an altercation that began at the parade tent, and according to testimony, the altercation became physical in the vehicle. Therefore, the trial court did not abuse its discretion by allowing this evidence.

¶22. Cummins claims that the jail video made him "look bad" and was prejudicial and not probative of any material fact. The trial court found that the video was admissible with a proper foundation. In the video, Cummins is seemingly bragging about killing Simpkins and Spann. Cummins stated. "You walk up on me man, I'm gone bust yo a** man." He also says, "I know it looks sweet. S*** ain't sweet man, two dead." The "two dead" clearly refers to the two victims. The video is clearly probative as proof of Cummins's motive, opportunity, and intent, and finding no danger of unfair prejudice substantially outweighing that probative value was not an abuse of discretion. *See White v. State*, 372 So. 3d 509, 515 (¶22) (Miss. Ct. App. 2023) (explaining evidence of defendant's prior bad acts is permitted for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity,

absence of mistake, or lack of accident). Therefore, the trial court did not abuse its discretion by allowing this evidence.

## V. Ineffective Assistance of Counsel

¶23. Cummins also contends that he received ineffective assistance of counsel. "[G]enerally, ineffective-assistance of counsel claims are more appropriately brought during post-conviction proceedings. This Court will address such claims on direct appeal when [1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that the findings of fact by a trial judge able to consider the demeanor of witnesses, etc.[,] are not needed. This Court has also resolved ineffective-assistance-of-counsel claims on direct appeal when the record affirmatively shows that the claims are without merit." *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020). Finding that the record affirmatively shows that Cummins's ineffective-assistance-of-counsel claim is without merit, we fully resolve his claim on direct appeal.

¶24. To prove his counsel was ineffective, Cummins must show (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *Kleckner v. State*, 230 So. 3d 1042, 1043-43 (¶5) (Miss. Ct. App. 2017). "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. (quoting *Quinn v. State*, 191 So. 3d 1227, 1234 (¶27) (Miss. 2016)). Cummins specifically alleges that his "trial counsel was ineffective and deficient by inviting invalid character and alleged prior bad act evidence presented to the jury

16

and failure to object to Jury Instructions 15, 19, 22 and by failing to seek an instruction on excusable accidental homicide committed during a valid act of self-defense and a Rule 105 limiting instruction regarding the domestic violence evidence."

### A.    Evidence of Alleged Prior Domestic Violence

¶25.    Cummins contends that defense counsel's introduction of allegedly unnecessary and damaging prior-bad-acts evidence constituted ineffective assistance of counsel. During trial, defense counsel asked a witness if she had ever seen Cummins and Lukens get in a physical altercation before. The witness responded that she had not seen them get into a physical altercation other than the one at the parade tent. Defense counsel then asked if the witness had ever heard of any physical altercations between Cummins and Lukens. The witness stated that Lukens had called her multiple times claiming that there had been a physical altercation between them. On redirect, the State asked the witness to elaborate on the physical altercations between Cummins and Lukens. Later in the trial, the State used this witness's testimony to impeach Lukens when she was asked if Cummins had ever become violent with her. We have held that "[w]ith respect to overall performance of the attorney, counsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim." *Id*. at 1044 (¶7). Defense counsel was seemingly trying to point out that the witness did not have any personal knowledge of Cummins and Lukens having any physical altercations. The decision to ask certain questions is part of trial strategy, and

Cummins's counsel could have chosen to ask these questions for several reasons. *Wilson v. State*, 102 So. 3d 1200, 1207 (¶33) (Miss. Ct. App. 2012) (finding the asking of a question does not fulfill either prong of the standard in *Strickland v. Washington*, 466 U.S. 668 (1984)). Thus, Cummins fails to show that his counsel's performance was deficient and that the deficiency prejudiced his defense.

¶26. Cummins also asserts that defense counsel should have requested a limiting instruction on the alleged domestic-violence evidence. However, this Court has held that "[c]ounsel's failure to request a limiting instruction rightly can be considered trial strategy. Counsel could well have determined that any such instruction could unduly highlight the testimony for the jury and simply chose not to do so." *Barnes v. State*, 348 So. 3d 974, 990 (¶39) (Miss. Ct. App. 2022). Therefore, we find that Cummins's ineffective-assistance-of-counsel claim is without merit.

### B.    Jury Instructions

¶27. Next, Cummins contends that defense counsel rendered constitutionally ineffective assistance for failing to object to Jury Instructions 15, 19, and 22. Failure to object to a proper jury instruction cannot be considered to be deficient performance. *See id.* at 990 (¶37). As noted above, these instructions are proper statements of the law, and when considered with the other instructions given to the jury, we find that the jury was properly instructed. We find Cummins's ineffective-assistance-of-counsel claim is without merit.

¶28. Cummins also argues that defense counsel failed to seek an instruction on accidental

homicide. "An intentional act cannot fit the doctrine of accident or misfortune." *Montana v. State*, 822 So. 2d 954, 962 (¶33) (Miss. 2002). All the evidence and testimony demonstrated that Cummins intentionally fired his gun. "It is fundamental in Mississippi jurisprudence that jury instructions must be supported by evidence." *Body v. State*, 394 So. 3d 1048, 1055 (¶32) (Miss. Ct. App. 2024). There was no evidence or testimony presented at trial to support an instruction on accidental homicide. During the trial, Cummins maintained that he was acting in self-defense when he fired his gun. Additionally, Cummins even admitted in his interview with Investigator Magee that he was trying to shoot at the people who hit him and had guns.

¶29.    Accordingly, we find Cummins's ineffective-assistance-of-counsel claim is without merit.

### VI.    Cumulative Error

¶30.    In his final assignment of error, Cummins argues that the cumulative effect of the foregoing warrants reversal. "Under the cumulative-error doctrine, individual errors may combine with other errors to make up reversible error, where the cumulative effect of all error deprives the defendant of a fundamentally fair trial." *Black v. State*, 400 So. 3d 464, 471 (¶26) (Miss. Ct. App. 2024) (quoting *Abram v. State*, 309 So. 3d 579, 586-87 (¶22) (Miss. Ct. App. 2020)). "However, where there is no error in part, there can be no reversible error to the whole." *Id*. Because we find there were no errors with Cummins's other issues on appeal, there can be no cumulative error to warrant reversal.

### CONCLUSION

¶31. The State presented sufficient evidence to support two convictions of first-degree murder, and the jury's verdict was not contrary to the overwhelming weight of the evidence. Therefore, Cummins is not entitled to an acquittal or a new trial. Additionally, the jury was properly instructed on the law and the permissive inferences that it could make based on its findings of fact. Furthermore, there is no cumulative error. Accordingly, we affirm Cummins's convictions and sentences.

¶32. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS AND McDONALD, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS AND McDONALD, JJ.**

**WILSON, P.J., DISSENTING:**

¶33. The Mississippi Supreme Court previously held that a jury instruction virtually identical to an instruction given at the trial in this case was "an incomplete statement of Mississippi law that [could] be used to misinform and mislead the jury." *Saxton v. State*, 385 So. 3d 753, 759 (¶28) (Miss. 2024). Because the instruction significantly impaired Cummins's self-defense claim, I would hold that it constituted plain error and requires a new trial. Accordingly, I respectfully dissent.

¶34. Jennifer Lukens testified that she and Cummins were in the front seat of Cummins's car arguing when "a really big guy" (Kam Owens)[5] suddenly opened the passenger side door

_____

[5] Owens testified that he is 6'4" and weighs approximately 270 pounds.

20

and "started punching [Cummins] in the face." Owens punched Cummins "at least three times," and Cummins was "dazed" by the sudden attack. Lukens "jumped from the driver's seat over [Cummins] and out the passenger side and got in [Owens's] face." Standing outside the vehicle, Lukens said to Owens, "What the f*** do you think you're doing?" Several other people ran up to join Owens. They were saying "they were going to beat [Cummins's] ass" because "'[t]he white boy [(i.e., Cummins)] was beating his bitch,' and stuff like that." Lukens begged the crowd "to please stop and please go." She "was also trying to check on" Cummins, who was still dazed from Owens's attack. Lukens then saw Joshua Spann, who was standing close to the car, remove two handguns from his backpack. Spann passed one gun to the man on his right (Jamarri Russell). "Spann was in a stance like he knew what he was doing with a gun." Then another large man (Andrew Brown) ran up to the car and "started hitting [Cummins] in the face." Brown "was on top of [Cummins] hitting him," and Lukens inserted herself between the two men, "trying to get [Brown] off of [Cummins]." As Brown attacked Cummins, Cummins reached for his gun, which was on the floorboard on the driver's side of the car. As soon as Cummins got possession of his gun, Brown got up and "started to run away." However, Spann and Russell remained nearby with their guns drawn. Russell "was right in front of" Cummins and Lukens and "pull[ed] the trigger." Cummins then fired his gun in the direction of Spann and Russell.

¶35.   Cummins similarly testified that he was seated in his car with Lukens when "a pretty big guy" (Owens) suddenly "struck [him] in the face." The blow "almost knocked [him]

21

out," he "was dazed," and "everything was fuzzy." Lukens came across the car and inserted herself between Cummins and Owens. She told Owens to stop hitting Cummins and to leave them alone. Then Brown ran up and started punching Cummins in the face. Lukens tried to kick Brown to get him off Cummins and yelled at Brown to back up. Cummins testified that the crowd around the car was threatening him and "saying they were going to beat the f*** out of [him]." They were saying, "'This bitch ass white boy was beating on his girl.'" Spann also said that "he was going to beat the f*** out of [Cummins]." While Brown was inside the vehicle hitting Cummins in the face, Cummins saw Spann take off his backpack. Spann pulled two guns out of the backpack, kept one, and handed the other to Russell. When Cummins saw that "guns were trained on [him]," he reached for his own gun, which was on the floorboard on the driver's side of the car. Brown was still striking Cummins. Spann was pointing his gun toward Cummins, and Russell "actually fired his weapon but it jammed." Cummins aimed his gun at Spann and fired. He testified that he did so because he "felt [the men] were going to kill [him and Lukens]." Cummins testified that the crowd outside the car turned and retreated only after he finished shooting. He testified that he fired his gun while still in the passenger seat of the car.

¶36. The surveillance video of the shooting does not contradict Lukens's and Cummins's testimony. The video shows Owens approach the car from the passenger side, open the car door, and reach into the car to strike Cummins. Owens backs up briefly and then reaches into the car to strike Cummins again. Lukens then emerges from the car's passenger side door

22

between Owens and Cummins. Lukens appears to try to push away Owens and others. Around this time, Spann takes off his backpack and removes two guns from it. Spann hands one gun to Russell, who appears particularly eager to receive the gun. As Russell and Spann arm themselves, Brown suddenly lunges into the car and strikes Cummins.[6] Lukens then emerges from the car's passenger side door again and appears to urge Brown and others to go away. Around the same time, Russell points his gun in the direction of Cummins and Lukens. It is difficult to determine from the video whether Spann also pointed his gun toward the car, although both Lukens and Cummins testified that he did.[7] Russell, Spann, Brown, Owens, and the rest of the crowd then disperse quickly. Russell continues to point his gun toward Cummins and Lukens as he retreats. The entire sequence of events from the time Owens first opens the car door until the crowd disperses lasted only about thirty seconds. The surveillance video does not have sound or show the interior of Cummins's car. Therefore, it is impossible to know if Russell and Spann drew their guns before or after Cummins retrieved his gun. However, the video shows that Cummins never stood up from the passenger seat prior to the shooting.

¶37. In light of all the testimony and evidence at Cummins's trial, Jury Instruction 19 is

---

[6] The majority opinion does not mention Brown's attack on Cummins, which followed Owens's attack on Cummins. However, consistent with Lukens's and Cummins's testimony, Brown's attack is clearly shown on the video.

[7] The majority opinion only briefly mentions that Spann and Russell had guns. Consistent with Lukens and Cummins's testimony, the surveillance video clearly shows both Spann and Russell arming themselves prior to the shooting and clearly shows Russell pointing his gun in the direction of Cummins and Lukens.

highly problematic. The instruction states:

> The Court instructs the jury that if the Defendant was the aggressor, the defense of self-defense is not available to him even where he must resort to defending himself against an unexpectedly aggressive intended victim.
>
> If you find from the evidence beyond a reasonable doubt that Jordan Cummins was assaulting Jennifer Lukens, you may consider him as the initial aggressor.

¶38. In *Saxton*, our Supreme Court held that a virtually identical instruction did "not provide a full and adequate statement of Mississippi law regarding self-defense." *Saxton*, 385 So. 3d at 758 (¶23). The Court noted that the instruction "fail[ed] to inform the jury that where the accused, acting in good faith, attempts to withdraw from the encounter and abandons his original purpose and intent, the accused would not be deprived of the right to assert self-defense even though it became necessary thereafter to slay his adversary." *Id.* at (¶22) (quotation marks omitted). In other words, the instruction failed to inform the jury that an initial aggressor may claim self-defense if he clearly and unequivocally abandons his original assault. *See Cunningham v. State*, No. 2023-KA-01213-COA, 2025 WL 2653670, at *6 (¶32) (Miss. Ct. App. Sept. 16, 2025) (motion for rehearing pending). The *Saxton* Court held that while such an instruction "is not necessarily an incorrect statement of Mississippi law, *it is an incomplete statement of Mississippi law that can be used to misinform and mislead the jury.*" *Saxton*, 385 So. 2d at 759 (¶28) (emphasis added). Because the defendant in *Saxton* did not object to the instruction, the issue was procedurally barred unless he could "demonstrate plain error" and "a manifest miscarriage of justice." *Id.* at 758-59 (¶27). The *Saxton* Court found that the instruction did not "result[] in a manifest

24

miscarriage of justice" because the identity of the "initial aggressor" was "wholly immaterial" on the particular facts of that case. *Id.* at 760 (¶¶37-38).

¶39. Here, however, Jury Instruction 19 foreclosed a claim of self-defense that should have been available to Cummins based on the evidence presented at trial. Specifically, Cummins should have been able to argue that he had clearly abandoned any alleged assault against Lukens.[8] Lukens and Cummins both testified that Cummins was dazed by Owens's assault and that Lukens climbed out of the car and put herself between Cummins and Owens. Lukens and Cummins also both testified that Lukens pled with Owens and the gathering angry crowd to leave her and Cummins alone. In addition, both Lukens and Cummins

---

[8] To be clear, although Cummins and Lukens testified that they were arguing and that Cummins struck the car seat and the dashboard, both denied that Cummins ever struck Lukens. Owens testified that he saw Cummins "beating [Lukens], punching her steadily" "[i]n the face." And Steven Porter testified that he saw Cummins "hit[] [Lukens] in the side of the head" "eight to ten" times. However, Detective Magee acknowledged that he interviewed Lukens within hours of the shooting and did not observe any injuries, abrasions, or other evidence that she had been physically assaulted.

The majority opinion seems to suggest that Cummins was not entitled to *any* self-defense instructions because he was the "initial aggressor." *Ante* at ¶¶17-19. The majority states that "testimony revealed that Cummins was aggressive with Lukens in the parking lot, and when others came to her defense," "Cummins continued his aggressive behavior and fired his weapon several times at them as they retreated." *Ante* at ¶17. The majority's description of what "testimony revealed" is based solely on the testimony of *the State's witnesses*, which directly conflicted with Lukens's and Cummins's testimony. Whether Cummins was the "initial aggressor" and what occurred after Owens punched Cummins were disputed issues of fact at trial. A court does not look solely to the *State's evidence* to determine whether a defendant is entitled to self-defense instructions. "In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, *no matter how meager or unlikely*, and the trial court's failure to do so is error requiring reversal of a judgment of conviction." *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995) (emphasis added).

25

testified that despite Lukens's attempts to bring an end to the altercation, Brown violently assaulted Cummins, and Russell and Spann pointed guns at Cummins and Lukens. The surveillance video of the events does not contradict—and to some extent corroborates—Lukens's and Cummins's testimony. Based on this evidence, Cummins should have been able to argue that any alleged altercation between him and Lukens was clearly over and that he was entitled to defend himself when Brown, Russell, and Spann nonetheless continued to assault and threaten him with guns. However, Jury Instruction 19 foreclosed that theory of defense by instructing the jury—*without qualification*—that "the defense of self-defense is not available to" an "initial aggressor." The court instructed the jury that if it found that Cummins "was assaulting . . . Lukens," he could not claim self-defense—*regardless of what else ensued*. That is an incomplete and misleading statement of the law that significantly prejudiced Cummins's defense. *Saxton*, 385 So. 2d at 759 (¶28).

¶40. As in *Saxton*, Cummins did not object to the jury instruction at trial and therefore must demonstrate "plain error" to prevail on appeal. "The plain error doctrine has a two-part test which requires: (i) an error at the trial level and (ii) such error resulted in a manifest miscarriage of justice." *Id.* at 759 (¶27) (quoting *Stephens v. State*, 911 So. 2d 424, 432 (¶19) (Miss. 2005)). In another recent case, the Court stated that "[t]o determine if plain error has occurred, we must determine if the trial court has deviated from a legal rule, whether that error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial." *Harrelson v. State*, 415 So. 3d 622, 628 (¶17) (Miss. 2025) (quotation

26

marks omitted) (quoting *Neal v. State*, 15 So. 3d 388, 403 (¶32) (Miss. 2009)).

¶41.    Here, there was "an error at the trial level." In *Saxton*, the Court made clear that the subject instruction is "an incomplete statement of Mississippi law that can be used to misinform and mislead the jury." *Saxton*, 385 So. 3d at 759 (¶28). Moreover, the error was plain, clear, or obvious. Just one month prior to Cummins's trial, the Supreme Court held in *Saxton* that it was error to give this same instruction.

¶42.    In addition, unlike in *Saxton*, the incomplete and misleading instruction given to the jury significantly impaired Cummins's defense. Multiple witnesses testified that Cummins struck Lukens and that Owens intervened to protect Lukens. Therefore, a rational jury certainly could have found that Cummins was, in the words of Jury Instruction 19, the "initial aggressor." However, as described above, there was also testimony and evidence that Lukens jumped between Cummins and Owens and pled with Owens and the crowd to leave her and Cummins alone and go away. In addition, there was testimony and evidence that despite Lukens's efforts to end the altercation, Brown dove into the car and punched Cummins in the head. All the while, according to Lukens and Cummins, Lukens tried to kick Brown out of the car and stop the fight. Moreover, there is evidence that Russell and Spann drew guns and pointed their guns at Cummins and Lukens. Based on this evidence, a rational *and properly instructed* jury could have found that Cummins was entitled to defend himself and Lukens *even if he was the initial aggressor*. However, Jury Instruction 19 was "an incomplete statement of Mississippi law." *Saxton*, 385 So. 3d at 759 (¶28). And on the facts of this

27

case, the instruction misinformed and misled the jury regarding Mississippi law. *Id.* Because the instruction improperly impaired Cummins's right of self-defense, I would hold that it prejudiced his defense and rose to the level of plain error.[9]  Accordingly, I respectfully dissent.

**WESTBROOKS AND McDONALD, JJ., JOIN THIS OPINION.**

---

[9] To be clear, there was sufficient evidence to support convicting Cummins. However, there was also conflicting and sufficient evidence to support Cummins's claim of self-defense. *See supra* note 8.  Giving Jury Instruction 19 requires reversal because it was an incomplete and misleading statement of Mississippi law and significantly impaired Cummins's right to claim self-defense.